IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

SUPER FILM OF AMERICA, INC.,     )
     )
    Plaintiff and Counterclaim Defendant,   )
     )
v.     )    Case No. 02-4146-JPO
     )
UCB FILMS, INC.,     )
     )
    Defendant and Counterclaimant,   )
     )
v.     )
     )
SUPER FILM SANAYI VE TICARET A.S.,   )
     )
    Counterclaim Defendant.   )

## MEMORANDUM AND ORDER

### I.  Introduction

This is a collection case gone awry.  Suit was filed by the plaintiff, Super Film of America, Inc. ("Super Film America"), to collect a $115,821 account from the defendant, UCB Films, Inc. ("UCB").  The account in question arose out of UCB's purchase of non-photographic film known as BOPP.[1]  In answer to the collection suit, UCB denied contracting with Super Film America and asserted a counterclaim to recover damages that allegedly were caused as a result of the film not complying with UCB's written specifications

---

[1] BOPP stands for bi-axially oriented polypropylene polymer.  It is a clear, plastic-based film often used in packaging applications.  The BOPP in this case was intended to be used by UCB as one component in its manufacture of laminated packaging products for sale to retailers, e.g., potpourri packaging.

and its particular purposes.  UCB's counterclaim was filed against not only Super Film America but also Super Film Sanayi Ve Ticaret A.S. ("Super Film Turkey"), alleging breach of contract, breach of express and implied warranties, fraud, and fraud by silence.

Super Film America and Super Film Turkey are not affiliated corporations in a technical, legal sense.  Supposedly, Super Film America is just the exclusive marketing and sales agent in the United States for products manufactured and distributed by Super Film Turkey.  However, UCB's basic theory of the case, and the overwhelming weight of the evidence at trial, was that Super Film Turkey almost totally controlled the seller's end of the subject transactions.

After five days of trial, with the undersigned magistrate judge presiding by consent of the parties, the jury returned a special verdict (doc. 169).  The jury found that UCB's contract was with Super Film Turkey, not Super Film America.  Thus, the jury implicitly found in favor of UCB with regard to Super Film America's suit for collection of the account; Super Film Turkey never asserted any right to collect the account on its own behalf.

On UCB's counterclaim, the jury found that Super Film Turkey had committed either fraud or fraud by silence.  Under the verdict form proposed by UCB and approved by the court, the jury then was relieved of any need to make any findings about breach of contract or breach of warranties by Super Film Turkey.[2]  The jury awarded UCB $120,000 in actual

---

[2] Although Super Film Turkey made no objection during trial to this aspect of the verdict form, Super Film Turkey now seeks a new trial on the basis that the jury was relieved of the obligation to make findings on the contract claims once fraud was determined.

damages on the counterclaim.[3]  Consistent with the bifurcated procedure contemplated by the Kansas punitive damages statute, which procedure the parties agreed should be followed in this diversity case, the jury found that it would be appropriate for the court to make a post-trial award of punitive damages against Super Film Turkey.  The court has entered judgment on the jury's verdict for actual damages (doc. 172).

The case is now before the court on Super Film Turkey's renewed, post-trial motion for judgment as a matter of law or, in the alternative, for a new trial (**doc. 175**), pursuant to Rules 50(b) and 59 of the Federal Rules of Civil Procedure.  Also pending is UCB's request that the court award at least $300,000 in punitive damages against Super Film Turkey.

Super Film America has taken no record position with regard to the pending post-trial matters, i.e., although the jury found that Super Film America was not entitled to collect its asserted account, the jury made no adverse findings with regard to Super Film America in connection with UCB's counterclaim.  And Super Film America has not filed any post-trial motions.

The above-described issues have been thoroughly briefed by Super Film Turkey and UCB (*see* docs. 176, 183-86, and 189).  In addition, on June 30, 2005, the court held a hearing on these issues.  The court is now ready to rule.

---

[3] The pretrial order (doc. 139) reflects that UCB originally had sought to recover several hundred thousand dollars in consequential damages.  During closing argument, though, UCB only asked the jury to award $161,490.

## II.  Super Film Turkey's Rule 50(b)
## Motion for Judgment as a Matter of Law

A post-trial, renewed motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure is appropriate only if the evidence, viewed in the light most favorable to the nonmoving party, "points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion."[4]  Such motions "should be cautiously and sparingly granted."[5]

In determining whether judgment as a matter of law is proper, the court may not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury.[6]  Rather, the court must affirm the jury verdict if, viewing the record in the light most favorable to the nonmoving party, it contains evidence upon which the jury could have properly returned a verdict for the nonmoving party.[7]  Conversely, though, the court must enter judgment as a matter of law in favor of the moving party if "there is no legally

---

[4] *Sanjuan v. IBP, Inc.*, 275 F.3d 1290, 1293 (10th Cir. 2002) (citing *Baty v. Williamette Indus., Inc.*, 172 F.3d 1232, 1241 (10th Cir. 1999)).

[5] *Black v. M & W Gear Co.*, 269 F.3d 1220, 1238 (10th Cir. 2001).

[6] *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1241 (10th Cir. 2001) (citing *Lockard v. Pizza Hut*, 162 F.3d 1062, 1068 (10th Cir. 1998)).

[7] *Roberts v. Progressive Independence, Inc.*, 183 F.3d 1215, 1219-20 (10th Cir. 1999) (citing *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1546 (10th Cir. 1996)).

sufficient evidentiary basis . . . with respect to a claim or defense . . . under the controlling law."[8]

UCB argues that Super Film Turkey's renewed post-trial Rule 50(b) motion for judgment as a matter of law should be summarily denied because the Rule 50(a) motions for judgment as a matter of law during trial were not sufficiently precise.  Specifically, UCB argues that Super Film Turkey's motion at the close of UCB's counterclaim case-in-chief was not specific enough to preserve any issues to renew.  The court disagrees.

"To preserve an issue for a renewed post-trial motion under Fed. R. Civ. P. 50(b), the movant must have made a proper motion pursuant to Rule 50, and the motion must be made with enough specificity to allow the non-movant an opportunity to cure possible defects in proof which might otherwise make its case legally insufficient."[9]  In this regard, the record reflects that, at the conclusion of UCB's defense of the account suit by Super Film America, which coincided with UCB's counterclaim case-in-chief against Super Film America and Super Film Turkey, the court inquired as to whether there were any motions, prompting the following remarks:

| MR. PALMER: [counsel for Super Film America] | Pursuant to Rule 15 [sic], the plaintiff [and counterclaim defendant, Super Film America] moves for judgment as a matter of law on UCB's fraud |
|---|---|

---

[8] *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1268 (10th Cir. 2000) (quoting *Harolds*, 82 F.3d at 1546-47).

[9] *Atchley v. Nordam Group, Inc.*, 180 F.3d 1143, 1147-48 (10th Cir. 1999) (citing *Lightning Lube Inc. v. Witco Corp.*, 4 F.3d 1153, 1172-73 (3rd Cir. 1993); *First Sec. Bank of Beaver, Okla. v. Taylor*, 964 F.2d 1053, 1056-57 (10th Cir. 1992)).

claims, suggest there is insufficient evidence to establish by clear and convincing evidence any fraud occurred, that Super Film knew at the time that the product was different, and that's what their allegation is based on.

THE COURT:                    Mr. Wright, anything further?

MR. WRIGHT:                   I'm going to move also on behalf of Super Film
[counsel for Super            Turkey that the Court rule as a matter of law that
Film Turkey]                  there is insufficient evidence to find that the
                              submitted claim for fraud as to Super Film Turkey.

THE COURT:                    For the reasons I indicated last week, although I continue to have some doubts about the ultimate viability of the claim of fraud, or the claim of fraud by silence, and have even more serious reservations about the appropriateness of any punitive damage awards in the event those claims are submitted, at this stage of the proceedings, in an abundance of caution, the motions of both Super Film America and Super Film Turkey are denied. . . .[10]

Then, after the close of all the evidence, the court inquired again whether the parties wished to renew their motions for judgment as a matter of law.  The relevant portions of the statements of counsel are as follows:

MR. PALMER:                   Super Film of America renews its Rule 50 motion on the counter claims, Your Honor.

THE COURT:                    Mr. Wright, the same for Super Film Turkey?

_____

[10] Tr. 848:24-849:25.

MR. WRIGHT:          Super Film Turkey also renews its motion for similar decision by the Court, noting that with a clear and convincing standard, I don't know if there's any reasonable evidence that could go to a jury that could be decided from a clear and convincing standard.  And I know there's a problem in the Court not including the fraud claim [in the submission of the case to the jury], because nobody wants to do the case over.  We don't want to create an opportunity for someone to go further with appeals or whatever. On the other hand, without any particular evidence in the record for it, I think we're also going along the same path.  So I do renew the motion.[11]

Given the above-described state of the trial record, the court finds that Super Film Turkey's Rule 50(a) motions during trial were sufficient to preserve the issue now before the court.  Accordingly, the court will proceed to the merits of Super Film Turkey's Rule 50(b) post-trial motion.

The special verdict form utilized in this case first asked the jury to decide with whom UCB had contracted.  As earlier indicated, the jury found that UCB's contract was with Super Film Turkey, not Super Film America.  Next, without any objection by Super Film Turkey, the jury was asked to answer "yes" or "no" to the following question:  "Did Super Film Turkey commit fraud or fraud by silence against UCB?"  Thus, the court must now review whether the evidence was sufficient to support a verdict against Super Film Turkey on either of these alternative theories.

---

[11] Tr. 917:2-21.

### A.   UCB's Fraud Claim

In order to succeed on a fraud counterclaim against Super Film Turkey, the parties concur that UCB was required to prove the following essential elements: (1) false representations were made as a statement of existing and material fact; (2) the representations were known to be false by the party making them, or were recklessly made without knowledge concerning them; (3) the representations were intentionally made for the purpose of inducing another party to act upon them; (4) the other party reasonably relied and acted upon the representations made; and (5) the other party sustained damage by relying upon them.[12]  Under Kansas law, which the parties agree controls this case, UCB was required to prove each of the five above-described essential elements by "clear and convincing" evidence.[13]

Super Film Turkey argues that UCB failed to establish the first two elements of fraud by clear and convincing evidence.  As to the first element, Super Film Turkey argues that the evidence was not clear and convincing that changing its resin suppliers for a product like

---

[12] *See* Pattern Instructions for Kansas (PIK) 3d 127.40.

[13] *See Davsko v. Golden Harvest Prod., Inc.*, 965 F. Supp. 1467, 1472 (D. Kan. 1997) (citing *Rajala v. Allied Corp.,* 919 F.2d 610, 626 (10th Cir. 1990), *cert. denied,* 500 U.S. 905 (1991)).  At trial, the court instructed the jury that "clear and convincing evidence means evidence that is certain, unambiguous, and plain to the understanding, and so reasonable and persuasive as to cause the jury to believe it.  *See* doc. 168, Instruction No. 27.  "Clear and convincing" evidence also has been defined as meaning that the witnesses must be found credible, their facts as testified to distinctly recalled, with the attendant details clear, direct, weighty, and lacking in confusion. *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 596 P.2d 816, 824 (Kan. 1979).

BOPP is a formulation change.  Additionally, Super Film Turkey argues that UCB's fraud claim is based only on the statement of Peter M. Ladas, Super Film *America's* director of sales, in a December 3, 2001 letter to Roy Woods [of UCB] that "[t]he product that UCB qualified for has not changed however, the product code numbers have: clear 10 mic (40 ga) old code 1014, *new code 1012V*, white 15mic (60 ga) old code 2592X, *new code 2211*."[14] As to the second essential element, Super Film Turkey argues that, even were the court to find that the evidence is sufficient to show that changing suppliers is a formulation change, the evidence was insufficient to show that Super Film Turkey knew that changing suppliers is a formulation change.

First of all, the court flatly rejects Super Film Turkey's assertion that UCB's fraud claim was based *solely* on the single statement of Mr. Ladas.  Rather, it was clear from the detailed provisions in paragraphs 5 through 7 of the pretrial order (doc. 139),  and equally clear from the way in which the case actually was tried, that UCB's fraud claim also was premised alternatively on two additional misrepresentations: (1) false statements concerning the 100% satisfaction guarantee that was given to UCB;  and (2) false statements concerning Super Film Turkey's policy to notify end-use customers, such as UCB, when Super Film Turkey changed formulas or the method of manufacturing BOPP.

The court thus turns to the pivotal issue of whether UCB provided the jury clear and convincing evidence of fraud.  As earlier indicated, during trial, the court expressed some

---

[14] Ex. U406.

reservations about the viability of UCB's counterclaim to the extent it was predicated on a fraud theory.  Had this case been tried to the court sitting without a jury, there probably would only have been a finding that Super Film Turkey breached warranties in connection with the sale of the subject goods – there probably would not have been any finding of fraud or fraud by silence.  But, of course, this was not a bench trial.  Despite the requirement that fraud be proven by clear and convincing evidence, a trial judge in a fraud case does not occupy the position of a "super juror" with veto power over a jury which draws its own reasonable inferences from a complex factual record.  The bottom line is this – in reviewing the evidence presented to the jury during trial in the light most favorable to UCB, the court finds that UCB has met its evidentiary burden, although just barely so.

This case has been intensely litigated for three years, procedurally and on the merits, and further proceedings appear inevitable.  Therefore, in order that the Court of Appeals can have the benefit of the trial court's perspective, a bit more than the usual amount of factual detail will be provided in this post-trial ruling.

This material facts of this case are technical and complex.  However, the court starts by noting here that the following facts are uncontroverted.[15]

> (1)   Super Film America is an Ohio corporation with its principal office in Dublin, Ohio.

> (2)   UCB is a Delaware corporation with its principal office in Smyrna, Georgia.

---

[15] Pretrial Order ¶ 4(a) (doc. 139, pp. 3-4).

(3)     Super Film Turkey is a Turkish corporation with its principal office in Baspinar, Gaziantep, Turkey.

(4)     Super Film Turkey is in the business of manufacturing polypropylene film, sometimes called bi-oriented polypropylene film, or "BOPP," which may generally be described as a clear, plastic-based film such as is often used in packaging.

(5)     At the times relevant to this suit, UCB operated and its parent corporation owned, a manufacturing plant in Tecumseh, Kansas, in which it used BOPP in some of the products manufactured at that plant.

(6)     Super Film is in the business of selling, in North America, products manufactured by Super Film Turkey.

(7)     In May 1999, UCB ordered a clear BOPP product, known as Suplain 1140-X, manufactured by Super Film Turkey for the purpose of testing that product as an alternate or additional supply of BOPP.

(8)     UCB's trial use of the BOPP was successful.

(9)     In April 2000, UCB purchased approximately 16,716 pounds of BOPP manufactured by Super Film Turkey.

As framed by the pretrial order (doc. 139), the parties' competing versions of the basic facts of the case are as follows:

### a.     Super Film America

Between March 7, 2002 and March 12, 2002, Super Film [America] delivered to UCB, upon UCB's order, and pursuant to specifications of UCB, an agreed quantity of clear polypropylene film at an agreed purchase price of $115,821.20. The parties' agreement provides that interest in the amount of 1.5% per month is payable on unpaid invoices. UCB has refused payment of the invoices when due. Therefore, UCB also owes Super Film [America]

interest at 1.5% per month on the $115,821.20 from April 11, 2002 until paid.[16]

**b.    UCB**

In early 1999, UCB executed an order confirmation from Super Film Turkey for a small order of 40 gauge BOPP, known as "1140-X" or "1014" BOPP.  Super Film Turkey knew that UCB was testing this shipment to determine if UCB could use this BOPP to produce low haze laminated cellophane film that is used in food packaging.  By April 2000, the results of the testing confirmed that such BOPP was merchantable and could be used for the particular end purpose that UCB intended.

UCB, however, did not place large orders for additional 40 gauge polypropylene from Super Film Turkey because it would take too long for the polypropylene to be shipped from Turkey.  Nevertheless, UCB eventually placed an order for 16,716 pounds of 40 gauge clear polypropylene in April 2001. Super Film [America], representing itself to be an extension of or liaison office for Super Film Turkey, repeatedly told UCB that it stood by its film 100% and "would take back the material, replace it or credit any of our customers in case of any dissatisfaction as long as claim (sic) is within reasonable period of time."  In actions and words, Super Film [America] and Super Film Turkey acted as a single economic unit in its dealings with UCB.[17]

Contemporaneous with UCB's execution of the order confirmation, UCB required the completion of a document identified as a Supplier Questionnaire.  Super Film [America] completed the questionnaire on behalf of Super Film Turkey, making express representations and warranties regarding the manufacturing practices of Super Film Turkey.  In the supplier questionnaire, Super Film [America] represented that it would notify UCB of any "manufacturing changes which may alter the performance characteristics of the product supplied."  UCB eventually received this shipment of 1014 BOPP and it was able to manufacture low haze (approximately 7% or less)

---

[16] Doc. 139 at ¶ 5(a), p. 5.

[17] In these factual contentions in the pretrial order, UCB stated that "Super Film" was intended to refer to both Super Film America or Super Film Turkey, who allegedly held themselves out to UCB as a single entity.

merchantable laminated composite film using Super Film Turkey's 1014 polypropylene.

To overcome the length of supply chain problem, Super Film [America] suggested that UCB warehouse the polypropylene and then retrieve it as necessary. Super Film [America] reiterated the 100% guarantee, and offered to satisfy UCB's requirements for polypropylene. In late 2001, prior to making further orders, UCB's buyer, Roy Woods, noticed that Super Film [America's] product code for the polypropylene had changed from "1014" to "1012V." He asked Peter Ladas of Super Film [America] to confirm that the polypropylene was not different from earlier shipments. Mr. Ladas wrote that "[t]he product that UCB has qualified for has not changed, however, the product code numbers have: clear 10 mic (40 ga) old code 1014, *new code 1012V*, white 15 mic (60 ga) old code 2592X, *new code 2211*."

UCB created a purchase order for 80,000 lbs. of 40 gauge clear polypropylene. Super Film Turkey sent an order confirmation directly to UCB. By signing the Super Film Turkey order confirmation, UCB accepted the terms offered by Super Film Turkey. Super Film Turkey shipped the polypropylene directly to UCB.

UCB soon encountered problems with the 1012V BOPP. First, some of the polypropylene pallets were not properly packaged or secured, and they sustained transit damage. Furthermore, when UCB ran the polypropylene through its manufacturing process, the finished laminated film product had a haze level in excess of 8%, much beyond UCB's needs and specifications. The resulting cellophane film could not be sold to UCB's customers. Moreover, the polypropylene rolls routinely caused web breaks, requiring that the poly-propylene repeatedly be re-threaded through scores of rollers and other production equipment, resulting in an inordinate amount of waste, downtime, and an unacceptably low yield of finished product.

UCB promptly notified Super Film about the hazing problems and web breaks. Upon notice of UCB's complaints regarding the polypropylene, Super Film's representatives met with UCB's personnel to discuss the defective polypropylene. During the meeting, UCB ran several trials with polypropylene supplied by AET (a Super Film competitor) and Super Film [America's] 1012V product. Cellophane film manufactured using AET's BOPP did not have excessive hazing. When all other manufacturing conditions were held constant, save for using Super Film's 1012V BOPP instead of AET's BOPP,

the finished cellophane film had a prominent haze that greatly exceeded UCB's specifications, rendering it unfit. UCB also experienced significant processing problems due to breakage. At that meeting, Super Film Turkey's export manager, Abidin Egeli, admitted that Super Film Turkey had changed its resin supplier. Stuart Richards further recounted that Super Film also agreed to "reimburse UCB Films for all waste generated in the aborted run to include cellophane, adhesive, BOPP, and lost machine time." UCB also advised Super Film of the former's belief that the increased haze levels for the finished cellophane film was due to slip additives in the 1012V BOPP migrating to the surface.

Since this meeting, UCB's expert work, including sophisticated and comprehensive testing, as well as manufacturing data supplied by Super Film, reveals that the BOPP supplied was subject to significant formulation changes and changes in the product that have altered the performance characteristics of the BOPP when used for its intended purpose. UCB would not have ordered the 1012V product had it known of these changes.[18]

c.    **Super Film Turkey**

In March 2002, Super Film Turkey produced, pursuant to specifications of UCB, an agreed quantity of clear polypropylene film. Super Film Turkey is in the business of manufacturing polypropylene film, sometimes called bi-oriented polypropylene film or BOPP, which may generally be described as a clear, plastic based film such as is often used in packaging. It was in compliance in all material respects with UCB's specifications.[19]

For purposes of determining whether UCB should be allowed to keep its fraud-based verdict based on the evidence that actually was admitted during trial, the court adopts the following numbered statements of fact[20] from UCB's post-trial brief[21]:

_____

[18] Doc. 139 at ¶ 5(b), pp. 5-9.

[19] Doc. 139 at ¶ 5(c), p. 9.

[20] Citing only four examples, Super Film Turkey claims that the 100 numbered statements of fact in UCB's brief are rife with mischaracterizations of the evidence. The court, however, has carefully reviewed not only its own notes but also the trial transcript and

. . .

5.  In 1999, UCB began a "qualification" process using Super Film Turkey's clear 40 micron BOPP to make laminated film for film packaging. (Ex. 472.) UCB hoped to replace its primary supplier, AET, with a less costly alternative. (Tr. at 553:9-554:14.)

6.  Qualification of a new supplier is costly and time consuming. (Tr. at 51:19-53:7.)

7.  According to Dr. Park [an expert witness retained by Super Film America][22], . . . after a qualification process has been undertaking [sic], industry custom is to supply future orders with the same specification, meaning the same "end product, BOPP, that was previously trialed and qualified. (Tr. at 504:23-505:22.)  Carl Olson [another expert retained by Super Film America] confirmed that it was customary to provide the "same product" when you reorder after going through qualification. (Tr. at 306:20-25.)

8.  According to Dr. Park, the general understanding in the film industry is that a supplier cannot change its product after going through a qualification process. (Tr. at 506:16-25.)   Mr. [Stewart Martin] Richards [formerly of UCB] confirmed that once qualified, it is industry custom that the product will not change for future shipments. (Tr. at 793:4-9.) Mr. Basel [the owner and president of Super Film America] also agreed that future shipments must conform to the qualified product. (Tr. at 51:14-18.)

---

exhibits, and finds that the statement of facts which it adopts accurately represent the evidence, at least viewing the evidence in a light favorable to UCB, as is required here.

[21] Doc. 183 at 7-13.

[22] However, it must be noted that *both* Super Film America and Super Film Turkey relied on the *same* witnesses in this case, i.e., from the court's vantage point, it appeared that the case was tried, strategically and tactically, with a unified front by the two Super Film entities.

9.      Mr. O'Brien [plant manager of UCB's Tecumseh, Kansas plant] confirmed the expectation in the industry that future shipments will perform the same as the trial material performed. (Tr. at 176:25-177:2.)

10.     Mr. Selbasti [technical director/manager of Super Firm Turkey], too, testified that it is standard industry practice for manufacturers to notify customers of "any changes" in the way a component [product] is manufactured, even if the component [product] still meets the initial technical specifications. (Tr. at 666:9-16, 669:19-670:9.)

11.     Informing customers of changes is important because of the ripple effect that a [sic] undisclosed change might have on the customer. (Tr. at 49:15-20, 50:11-15.)

12.     Beginning in 2000, Super Film . . . America repeatedly represented to UCB that Super Film Turkey's clear 40 micron BOPP came with a 100% satisfaction guarantee.

   a.      In May 2000, Mr. Wooldridge, the US Sales Manager for Super Film Turkey's products, while soliciting a BOPP order, wrote UCB telling them "We will guarantee our film should there be any problems." (Ex. 458.)

   b.      In October 2000, Mr. Wooldridge, while soliciting a BOPP order, wrote that "if for some reason there was a problem with our film we would take it back." (Ex. 456.)

   c.      In January 2001, Mr. Wooldridge wrote UCB, telling them "we guarantee the quality of our film for 6 mos." (Ex. 453.) .

   d.      In February 2001, Mr. Basel wrote that . . . [we] "will take back the material, replace it or credit any of our customers in case of dissatisfaction" with any BOPP. (Ex. 450.)

   e.      In May 2002, Super Film [America] reiterated that "we will stand behind our film 100%."(Ex. 411.)

13.     . . . [Persons within] management [on the seller side of the subject transactions were] . . . aware of the warranty promises being made to UCB by Mr. Wooldridge in an attempt to secure business from UCB:

Mr. Basel, president of Super Film of America, and Mr. Egeli, Export Manager for Super Film Turkey, were cc'd on correspondence to UCB in which such express warrantees were made. See Ex. 453 and Ex. 456; Tr. at 71:2-19.) . . . management did not repudiate any of the express, 100% guarantees made by Mr. Wooldridge. (Tr. at 71:20-25.)

. . .

16.    In April 2001, after internal testing revealed that Super Film Turkey's BOPP could be used in UCB's lamination process to produce merchantable low haze laminated film, UCB finally placed an order for approximately 12,000 pounds of such film (product code 1014). (Ex. 439.)

17.    In October 2001 and November 2001, Roy Woods, UCB's buyer, contacted Mr. Ladas [sales representative for Super Film America], the US Sales Manager for Super Film Turkey's products, and specifically asked whether UCB could "send it back" if the BOPP if it did not work for UCB. Exs. 403, 405; Tr. at 571:10-20). Mr. Ladas, as Super Film Turkey's agent, expressly confirmed that the BOPP had a "100% guarantee." (Tr. at 571:10-20, 575:11-19.)

18.    This guarantee was important to UCB because a product failure would interfere with UCB's production and for the 80,000 pound order contemplated (an approximate six month supply), UCB wanted to be sure that it was not saddled with product it could not use. (Tr. at 567:5-14, 576:6-14.)

19.    UCB understood the 100% guarantee in its literal and ordinary sense, meaning that UCB could return the product for any reason whatsoever. (Tr. at 177:13-178:17.)

20.    At trial, acknowledging that his prior statements to UCB that Super Film [America] would take film back "in case of any dissatisfaction" did not represent . . . [the] true policy, Mr. Basel stated: "That's a wrong thing. I take it back." (Ex. 450; Tr. at 78:20-22.)

21.    Mr. Basel knew that Super Film Turkey [sic] true warranty is that the "only reason" it will take back film is if it "doesn't meet the customer's specifications." (Tr. at 777:4-16.) Basel knew that this was . . . [the]

unwavering warranty policy in February 2001, when he misrepresented to UCB that it could return film if UCB was dissatisfied. (Tr. at 777:17-19, 778:11-23.)

22.    Under . . . [the] true policy, before . . . [the seller] will take back film, the customer has "to prove" to . . . [the seller's] satisfaction there is a problem with the film. (Tr. at 78:16-19, 125:16-21.)

23.    When Mr. Woods was also informed that the BOPP previously identified by product code "1014" was being sold under product code "1012V", he specifically inquired as to whether 1012V was different from 1014 in any way. (Tr. at 574:3-12.)

24.    Mr. Ladas expressly represented that "the product that UCB has qualified for has not changed." (Ex. 406.) Ladas' source for that statement is Mr. Basel. (Tr. at 88:13-21) ("He must have talked to me").

25.    Mr. Ladas verbally reassured Mr. Woods that 1012V was "exactly the same" and "identical" to the 1014 that had been purchased previously. (Tr. at 243:25-244:14) ("absolutely no difference").

26.    Mr. Egeli, Super Film Turkey's then-Export Manager, was considered "top management" at Super Film Turkey. (Tr. at 35:11-20.)

27.    Mr. Basel admits Super Film Turkey personnel repeatedly told him that there were "absolutely no changes" and "it's the same film" when he inquired. (Tr. at 19:18-20, 84:16-85:2).

28.    Super Film . . . America represented to UCB that the 1012V film "was identical in all respects from the previous shipments" because Mr. Basel "was assured of that" by Super Film Turkey, including Mr. Egeli. (Tr. at 85:3-10.). Mr. Basel described Egeli, the Export Manager, as a "sure source" of information regarding the BOPP. (Tr. at 86:10-13.)

29.    Mr. Egeli knew that 1012V was made with a different resin than 1014 and admitted as much to UCB in a March 2002 meeting. (Ex. 410.)

30.    The primary ingredient (approximately 95% by weight) used to make BOPP is homopolymer polypropylene (resin). (Ex. 520.)

31.     According to Dr. Park, . . ., and manufacturing literature he pronounces to be authoritative, the type of resin used to make film is a key determinant of the amount of haze that a film displays. (Ex. 538; Tr. at 521:2-16.)

32.     The homopolymer polypropylene (resin) that Super Film Turkey used to manufacture the 1014 BOPP that was supplied to fill UCB's April 2001 order was "Basell KF6190H." (Ex. 520 at SFA00119A.)

33.     The December 2001 order for 1012V was manufactured in five lots, using two different homopolymer polypropylenes: "Basell 422H" and "Borealis HC101." (Ex. 520 at SFA 00123A and SFA000127A.) (Note: Basell and Borealis are different resin manufacturers.)

34.     According to Mr. Selbasti, if a product's code changes and there is no specific assurance from the supplier to the contrary, the presumption is that the different code reflects a formula change. (Tr. at 713:14-18.)

35.     According to the manufacturer, Basell, "422H" is sold under the trade name "MOPLEN" and "KF6190" is sold under the trade name "Pro-Fax". (Ex. 484.)

36.     The manufacturer, Basell, describes 422H as a "modified homopolymer polypropylene," with "good" optical properties but describes "KF6190" as having "excellent" transparency and as a pure homopolymer polypropylene. (Ex. 484.)

37.     Melt flow rates are deemed to be important factors contributing to film optics and haze, according to . . . [the] experts [relied on by Super Film America and Super Film Turkey]. (Tr. at 445:14-15.)

38.      The melt flow rates for "KF6190" and "422H" are different, according to the manufacturer's literature. (Ex. 484.)

39.     Dr. Willard [another expert retained by UCB] testified that Basell KF6190 is materially different from Basell 422H. (Tr. at 409:15-410:4.)("those are not the same").

40.     At the time UCB's order for 1012V was placed, Mr. Selbasti admitted that Super Film Turkey "was not looking at this time to add Basell KF6190H" resin to the 1012V. (Tr. at 729:5-6) (emphasis added).

41.     Selbasti's testimony established that Super Film [Turkey] did not intend to manufacture the 1012V using Basell KF 6190 (which had been used to make the 1014 BOPP ordered in April 2001):

        Q.      Are you saying at the time the order was taken it was not your intention to use [Basell] 6190 as the resin to fill the 1012V order?
        A.      Not on my.
        Q.      It wasn't the intention of Super Film [Turkey]?
        A.      Not my intention, no.
                (Tr. at 729:15-22.)

42.     Mr. Selbasti admitted that Super Film [Turkey] uses any of five different resins to make BOPP. (Tr. at 705:9-19, 706:3-10.)

43.     In May 2001, Mr. Basel signed a Supplier Questionnaire on behalf of Super Film Turkey in which he stated that Super Film Turkey's policy was to inform customers like UCB of any "change in formulation or manufacturing method that may affect performance characteristics, including changes to . . . specifications." (Ex. 401; Tr. at 44:5-25.[23])

44.     According to Mr. Basel, a change of a raw material supplier by . . . would qualify as a manufacturing change. (Tr. at 48:23-49:1.)

45.     Basel's source of information for answering the Supplier Questionnaire was Super Film Turkey. (Tr. at 134:1-20, 776:25-777:1) ("I know from the manufacturer, Super Film Turkey").

46.     Mr. Basel testified that he would answer the question regarding formulation change on Exhibit 401 the same day today as he did in May 2001. (Tr. at 776:3-8) ("yes").

---

[23] The court finds the evidentiary support for this statement is *not* found on page 44 of the trial transcript. Nonetheless, Ex. 401 does support this statement.

47.     Mr. Selbasti confirmed that Exhibit 401 includes a promise to inform customers of changes that alter Super Film Turkey's specifications. (Tr. at 895:2-7.)

48.     Mr. O'Brien, too, interpreted Exhibit 401 as requiring notice of any change of a major raw material to a product, including resin. (Tr. at 154:21-155:11.)

49.     A "masterbatch" is an additive placed in a resin (homopolymer polypropylene) base. (Tr. at 710:10-13.) The principle [sic] ingredient of a "masterbatch" is homopolymer polypropylene, also referred to as "resin," which comprises more than 90% of the masterbatch by weight. (Tr. at 733:12-734:1)

50.     Super Film Turkey purchases masterbatch from other suppliers and uses masterbatch in the manufacture of BOPP. (Tr. at 709:4-11[24]; Exs. 514, 520.)

51.     Super Film Turkey expects its masterbatch suppliers to inform it if they make a change in homopolymer polypropylene because it is "industry practice" (Tr. at 734:18-735:8.)

52.     According to Mr. Selbasti, a change in homopolymer polypropylene by a masterbatch supplier *would be considered a "change in formulation."* (Tr. at 735:9-15) (emphasis added).

53.     Mr. Selbasti conceded that expecting masterbatch suppliers to provide notice to Super Film [Turkey] if they changed their base ingredient (homopolymer polypropylene) without also requiring Super Film [Turkey] to notify customers if it changed its own homopolymerpoly-propylene is "contradictory." (Tr. at 735:23-736:5.)

54.     According to Mr. Selbasti, Super Film Turkey's certificates of analysis (Exs. 418 and 432) show . . . [its] own internal technical parameters (specifications) for its products, including the minimum and maximum

---

[24] The court finds the evidentiary support for this statement is found at pp. 710:4-711:7 of the transcript, rather than p. 709.

allowable values for haze. (Tr. at 693:9-14.) It is fair to compare Exhibit 418 to Exhibit 418. (Tr. at 690:3-15, 692:4-9.)

55.    According to Mr. Selbasti, technical specifications (parameters) should not change if a product formulation or manufacturing method has not changed. (Tr. at 684:2-5, 693:20-694:1.) He also testified that a change in technical specifications is indicative of a formulation change. (Tr. at 693:15-19.)

56.    Dr. Willard, too, testified that technical specifications or standards for a product should not change if a product does not itself change. (Tr. at 384:13-16.)

57.    Dr. Park, Super Film's expert, also testified that if Super Film did not change its formulation or manufacturing process, its product specifications should not change. (Tr. at 499:3-7.)

58.    According to Dr. Park, the certificate of analysis for 1012V shows a change in technical specifications (compared to the haze parameters for 1014), with the former having a maximum haze value of 2.0% while the latter's maximum value was 1.8%. (Tr. at 499:11-500:5, 500:15-25; Exs. 418, 432).

59.     Mr. Selbasti admitted that Super Film's technical specification for the maximum haze in 1014 BOPP was 1.8%. (Tr. at 696:6-14.)

60.    Mr. Selbasti admitted that Super Film's technical specification for the maximum haze in 1012V BOPP was 2.0%. (Tr. at 696:15-19.)

61.    Mr. Selbasti conceded that Super Film's haze specification for 1012V did change from the specification for 1014. (Tr. at 894:19-897:3.)

62.    Dr. Willard concluded that 1012V and 1014 "were not the same." (Tr. at 373:22-24[25], 410:5-11.)

. . .

---

[25] The court finds the evidentiary support for this statement is not found on page 373 of the transcript, but is found on page 410, as also cited by UCB.

It was essentially uncontroverted at trial that, despite the successful trial purchase order in April 2001, the larger BOPP order that was shipped to UCB in December 2001 was ill-suited to UCB's specifications and end-product needs.  That is, when used in the same lamination process that UCB utilized in the trial process, the goods in question resulted in a packaging product that had far too much haze to be of commercial benefit, e.g., the potpourri bags made by UCB with the BOPP were so hazy that the consumer could not readily see the product in the bag.  The BOPP not yet used to manufacture more packaging product by UCB has only salvage value.

Most, if not all, the witnesses who testified during the trial of this case generally struck the court as polite, well-educated, articulate, and fairly sophisticated and experienced in their respective fields.  Nevertheless, on all of the issues presented, and specifically on the ultimate issue of fraud, the jury was entitled to believe UCB's witnesses and disbelieve those presented by the two Super Film parties.  Most notable in this regard is Turgut Selbasti, Super Film Turkey's technical director, who sat with counsel as that party's corporate corporate representative and who testified extensively during trial.  Perhaps Mr. Selbasti testified truthfully in all respects  – there is no way for the court to tell for sure.  But with all due respect to Mr. Selbasti, the simple fact of the matter is that his credibility – and in turn the viability of Super Film Turkeys' defense of the counterclaim  –  was challenged on more than one occasion when he testified in a manner that appeared, at least to the trial judge, as somewhat inconsistent, evasive, and arrogant.  Ultimately, as mentioned before, it was within

the jury's province to determine whether Mr. Selbasti testified truthfully or untruthfully, in whole or in part.  The post-trial papers filed by Super Film Turkey implicitly seem to ignore this unavoidable risk of having taken this case to trial.

In any event, based on the foregoing, the court finds that, viewed in the light more favorable to UCB, clear and convincing evidence was presented at trial to support a finding by the jury that Super Film Turkey made false representations of material fact to UCB. Further, the court finds that clear and convincing evidence was presented at trial to support a finding by the jury that Super Film Turkey knew the representations were false when making them.  And, of course, the evidence is almost undisputed that UCB was damaged as a result of Super Film Turkey's conduct.

### B.   UCB's Fraud by Silence Claim

As earlier indicated, by special verdict, and without objection, the jury was asked to decide if Super Film Turkey had committed either fraud or fraud by silence.  In order for UCB to succeed on the alternatively pleaded fraud by silence counterclaim, the parties agree that UCB was required to prove by clear and convincing evidence that: (1) Super Film Turkey had knowledge of material facts which UCB did not have and which UCB could not have discovered by the exercise of reasonable diligence; (2) Super Film Turkey was under an obligation to communicate the material facts to UCB; (3) Super Film Turkey intentionally failed to communicate to UCB the material facts; (4) UCB justifiably relied upon Super Film

Turkey to communicate the material facts to UCB; and (5) UCB sustained damages as a result of Super Film Turkey's failure to communicate this to UCB.

Super Film Turkey's only argument with regard to this alternative claim is that there is no evidence, or insufficient evidence, that Super Film Turkey knew that changing suppliers is a formulation change. Again, though, viewing the previously discussed evidence at trial in the light most favorable to UCB (*see* section II(A) above), the court finds there was clear and convincing evidence that Super Film Turkey knew that changing suppliers is a formulation change. Thus, the fraud by silence claim is sustainable.

### III. Super Film Turkey's Alternative
### Rule 59 Motion for a New Trial

In the alternative to its motion for judgment as a matter of law on UCB's fraud claim, Super Film Turkey asserts that the verdict form contained prejudicial error, and therefore, a new trial should be granted pursuant Rule 59 of the Federal Rules of Civil Procedure. Super Film Turkey argues that the court erred by adopting a form of verdict proposed by UCB that required the jury elect between UCB's fraud and breach of contract remedies.

Although completely ignored in the briefs filed by Super Film Turkey, the court must begin its analysis by determining whether the movant has complied with Rule 51(c)(1) of the Federal Rules of Civil Procedure. It provides that "[a] party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds of the objection." Ordinarily, a party waives the right to object to an instruction or verdict form in a motion for new trial if he failed to raise a timely

objection before the jury retired.[26]  An exception to this rule allows the court to review the erroneous instruction or verdict form only if it amounted to plain error.[27]  As explained in more detail below, during trial Super Film Turkey never made any objection to the verdict form along the lines now advanced in support of its motion for a new trial.  Moreover, the court is wholly unpersuaded that the form of verdict constituted any error, let alone plain error.

In accordance with Rule 51, the court's pretrial order (doc. 139, pp. 38-39) specifically directed the parties to file proposed jury instructions before trial.  Initially, although both Super Film America and UCB filed proposed instructions (*see* docs. 149 and 151, respectively), Super Film Turkey did not submit any of its own proposed instructions or a verdict form to the court.  During trial, however, the court strongly encouraged counsel to confer further with regard to a set of jury instructions that could be largely stipulated, because the court believed the ultimate issues presented were fairly straight-forward, being controlled by the Kansas version of the Uniform Commercial Code and well-established Kansas common law dealing with fraud.  The parties accommodated the court's request on virtually all of the instructions, although ultimately they could not agree on a form of verdict (*see* doc. 167).

---

[26] *Kloepfer v. Honda Motor Co., Ltd.*, 898 F.2d 1452, 1456 (10th Cir. 1990) (citing *Lusby v. T.G. & Y. Stores, Inc.*, 796 F.2d 1307, 1311 (10th Cir.), *cert. denied*, 479 U.S. 884 (1986); Fed. R. Civ. P. 51).

[27] *Id.* (citing *Fiedler v. McKea Corp.*, 605 F.2d 542, 548 n.4 (10th Cir.1979)).

UCB incorrectly argues in its post-trial brief that Super Film Turkey never submitted a proposed verdict form.  The record plainly reflects that Super Firm America and Super Film Turkey, speaking with one voice, did propose a verdict form that would have had the jury, as its first order of business, decide whether UCB had a contract with *anyone* (i.e., with *either* Super Film America or Super Film Turkey) (*see* attachment 2 to doc. 167).  But, as explained in more detail below, the form of verdict which was proposed by Super Film Turkey, and which the court ultimately declined to use, did *not* reflect the concern or objection now made post-trial for the first time by Super Film Turkey.

It should also be noted that, near the conclusion of trial, the court provided the parties with a copy of its proposed instructions before submitting them to the jury, and gave the parties an opportunity to object.  Significantly, Super Film Turkey never made any objections to the verdict form on the record along the lines now articulated in Super Film Turkey's motion for a new trial.  The *only* objections that Super Film Turkey made about the verdict form during the instruction conference were as follows:

> THE COURT:      Mr. Wright, how about you?
>
> MR. WRIGHT:     No. To the verdict form?
>
> THE COURT:      Yes.
>
> MR. WRIGHT:     In general, yes.
>
> THE COURT:      Specifically.
>
> MR. WRIGHT:     In general and specifically. Well, I am puzzled by the formation that it now appears in. We [Super Film

America and Super Film Turkey] offered the Court the opportunity to consider as to whether or not there was a contract necessarily formed in this case and began by asking the jury whether anybody entered into a contract. We tell them what the elements of a contract are, we tell them how a person goes about forming it, and we tell them what the burden of proof is to do that. It's by a greater weight of the evidence. And then we tell them: With whom did they make a contract? We don't give them the opportunity to ask whether they did or whether they didn't. I see the Court's reasoning for doing that. However, as you plow on through here, if, in fact, they find that there was a contract between Super Film Turkey and the other, we have then two bases of recovery, both fraud and, apparently, in 3 we're talking about some kind of breach of contract. I didn't understand that to be possible under the present formation that we had here in this particular case because of the-- this whole question of what Super Film Turkey's role was. I think it's confusing, and I don't, right off the top of my head, have a great solution for it, but I feel like there must be some way in which people could say that the burden of proof wasn't carried with regard to formation of a contract with anybody.

THE COURT:      That was the first question posed in–

MR. WRIGHT:     Correct.

THE COURT:      -- the Super Film proposed verdict.

MR. WRIGHT:     Correct. And if you don't have that, I think you are denying the jury, A, the possibility that nobody at the same time ever got together and ever had a meeting of the minds. That's-- I just-- I'm puzzled as to how it cannot be that way.

THE COURT:      For the record, my ruling remains on that issue the same as yesterday, and I am ultimately persuaded by the arguments advanced by Mr. Rameden [counsel for

UCB]. I think in this transaction, given the totality of the evidence, it's clear to me that UCB had a contract with somebody, and it's going to be the jury that's going to sort out with whom. But further for the record, Mr. Wright, beyond the general form of verdict-- or excuse me--the form of special verdict that the two Super Film entities included within the March 26 filing, is there any other solution that you have to this issue?

MR. WRIGHT:       No, there is not. That was my solution.[28]

Accordingly, given the state of the record, the court finds that Super Film Turkey waived its right to challenge the verdict form by timely failing to object.

Further, even had Super Film Turkey not waived this issue procedurally, the court is unpersuaded by Super Film Turkey's substantive argument that the verdict form was erroneous. Under the form of verdict used by the court, the first determination the jury had to make was *with whom* UCB had a contract regarding the purchase of 1012V BOPP; as earlier indicated, given that it was crystal clear that at a minimum UCB had a contract with *somebody*, the court's formulation of the "with whom" question implicitly assured the existence of *a* contract. The jury could choose, under the court's verdict form (without any objection by any party), Super Film America *or* Super Film Turkey, but not both. The jury chose Super Film Turkey. Having chosen Super Film Turkey, the jury was then instructed to answer whether Super Film Turkey had committed fraud or fraud by silence against UCB; the jury answered "yes." Next, the jury was instructed to determine the amount of actual

---

[28] Doc. 187, Tr. 18:8-20:24.

damages UCB had suffered as a result of such fraud or fraud by silence, and lastly whether punitive damages should be awarded to UCB and against Super Film Turkey (with the amount to be determined by the court later).  The jury's deliberations were then completed.

Under the verdict form, if the jury had answered "no" to whether Super Film Turkey committed fraud or fraud by silence against UCB, the jury then was instructed to decide whether Super Film Turkey had breached its contract with UCB, including any express or implied warranties and, depending on the answer, to assess damages.  The gist of Super Film Turkey's motion for a new trial is that the court's decision to require the jury to "elect" between fraud and breach of contract constitutes prejudicial error.

Super Film Turkey claims that this verdict form induced the jury to find fraud in the interest of completing its assigned tasks quickly.  Super Film Turkey further claims that, had the breach of contract claim been presented first on the verdict form, and had the jury not been required to "elect" between the fraud and contract theories of recovery, the ultimate result probably would have been different.

Conspicuously, Super Film Turkey has failed to cite *any* case that supports its arguments, even by reply brief after such deficiency was raised by UCB in the brief filed in opposition to the instant motion.  Further, the court agrees with UCB that Super Film Turkey's arguments are based on mere speculation about how the jury might have eventually found if it had considered the breach of contract claims in addition to the fraud claims.

Simply stated, there is no evidence in the record from which it can reasonably be inferred that the jury was somehow induced by the form of verdict to complete its deliberations quickly.  This is borne out by the fact that the jury actually deliberated for about three hours before returning its signed verdict.  Further, the court agrees with UCB that the verdict form correctly instructed the jury on the law and outlined an orderly analytical framework that was fully justified by the evidence.

## IV.  Amount of Punitive Damages to be Awarded

As previously stated, based on its finding of fraud, the jury specifically found that an award of punitive damages against Super Film Turkey, while not absolutely required, nevertheless was appropriate under the facts of this case.  The parties agreed during trial that, consistent with the relevant Kansas statutes, if the jury returned such a finding, the court would later determine the amount of punitive damages, *if any*, to be awarded.

In determining whether an award of punitive damages is warranted in this case, the court considers the factors listed in K.S.A. § 60-3702(b).  Of course, these factors are not exclusive.[29]  And they should not be applied mechanistically.[30]

---

[29] *Ensminger v. Terminex Int'l Co., Scheufler v. General Host Corp.*, 915 F. Supp. 236, 241 (D. Kan. 1995); *Citizens State Bank v. Shearson Lehman Brothers, Inc.*, 874 F. Supp. 307, 310 (D. Kan. 1994);  *Patton v. TIC United Corp.*, 859 F. Supp. 509, 513 (D. Kan. 1994).

[30] *Shearson*, 874 F. Supp at 310.

### A. Likelihood at the Time of Misconduct that Serious Harm Would Arise and the Degree of the Awareness of that Likelihood

The analysis of these two factors go hand in hand in this case. The evidence supports UCB's claim that Super Film Turkey misrepresented that, as far as BOPP was concerned, "1012V" was identical to "1014." Super Film Turkey knew, or certainly *should* have known, that UCB's reputation and standing in the industry would suffer serious harm if the substitute BOPP caused production of an inferior end-use product by UCB. It would likely follow that UCB would suffer great economic harm as a result of using the substituted BOPP which resulted in the production of an inferior end-product. Further, Super Film Turkey created the likely scenario that UCB might not be able to supply its customers with laminated film on a timely basis. Accordingly, the court finds that these factors favor a substantial assessment of punitive damages against Super Film Turkey.

### B. Profitability of the Misconduct

There has been no showing whether Super Film Turkey's misconduct was profitable. This factor, therefore, is neutral.

### C. Duration of the Misconduct, any Concealment of it, and the Attitude and Conduct upon Discovery of the Misconduct

Here again, the analyses of these factors go hand in hand in the case at bar. Despite overwhelming evidence to the contrary, Super Film Turkey has consistently maintained its position that "1012V" BOPP was the same as the "1014" BOPP, and thus there had been no change in formula or manufacturing since UCB first complained about the 1012V product.

Despite having seen its case collapse in front of a jury, Super Film Turkey stubbornly has failed to express *any* remorse for the representations made to UCB. This factor strongly militates in favor of a substantial punitive damages award.

### D.      Financial Condition of Defendant

Super Film Turkey is a large manufacturer that ships its products worldwide.[31] It has United States sales of $9.5 million over three years.[32] However, despite numerous discovery requests, Super Film Turkey did not timely provide UCB with reasonable documentation of the former's assets and income statements.

Where a defendant refuses to provide information concerning its financial condition, Kansas courts make an adverse inference against the recalcitrant party in assessing punitive damages.[33] Based on the limited record presented (which of course is no fault of UCB's), the court finds that Super Film Turkey is capable of paying a substantial punitive damages award, and thus this factor favors a substantial punitive damages award.

### E.      Total Deterrent Effect of Other Damages and Punishment Imposed Upon the Defendant as a Result of the Misconduct

This factor typically looks to whether the party against whom punitive damages are to be assessed already has been punished in another proceeding (e.g., a criminal proceeding). The only damages or punishment incurred by Super Film Turkey to date are the $120,000

---

[31]  Fact 97.

[32]  Tr. at 27:4-10.

[33]  *See Waldrip v. Hart*, 949 F. Supp. 801, 804 (D. Kan. 1996).

compensatory damages awarded by the jury to UCB. Super Film Turkey is not subject to any related criminal or civil proceeding.

###    F.    Other Considerations

In addition to the factors specifically mentioned in K.S.A. § 60-3702(b), the amount of litigation expenses incurred, including attorneys' fees, may be considered in awarding punitive damages.[34] The court has no reason to believe that the relatively high cost of litigating this case was caused by any of the fine trial lawyers who were involved.[35] Although there is nothing in the record to support the notion that it was UCB alone trying to hold down the cost of this litigation, it is reasonable to infer here that Super Film Turkey's stubbornness in failing to acknowledge the fairly obvious significance of changing the resins used in its BOPP was the *main* cause of this litigation being so protracted and expensive. This factor, therefore, weighs in favor of a substantial punitive damages award.

UCB claims that through trial it has incurred expenses of approximately $360,000, including attorneys' fees and expert and consulting fees.[36] This includes the expense of

---

[34] *Smith v. Printup*, 601, 938 P.2d 1261, 1273 (Kan. 1997); *Wardrip v. Hart*, 949 F. Supp. 801, 803 (D. Kan. 1996); *Scheufler v. General Host Corp.*, 915 F. Supp. 236, 243 (D. Kan. 1995).

[35] There was no specific evidence presented in this regard. Still, though, the court was left with the distinct impression during trial that the extremely hard-fought nature of this relatively small commercial case was essentially client-driven, i.e., by experienced and sophisticated business people who were convinced in their own minds that they were absolutely right and that the other side was absolutely wrong.

[36] Rameden Decl. ¶ 14(a).

defending the collection suit brought by Super Film America and pursuing numerous discovery disputes related to Super Film America and Super Film Turkey's failure to provide relevant information which eventually gave rise to the amendment of UCB's answer and assertion of counterclaims against Super Film Turkey.

Although the court has found that the high cost of litigating this case weighs in favor of a significant punitive damage award against Super Film Turkey, this factor has very definite limitations. Simply stated, even assuming for the sake of discussion that Super Film America's $115,821 collection lawsuit against UCB could not have been settled early on for some discounted figure (which is a *big* assumption here in UCB's favor), UCB either knew or at the very least should have known long before trial that it would not be in a position to ask the jury for more than approximately $160,000 in actual damages in connection with the counterclaim against Super Film America and Super Film Turkey. Thus, given that under the facts presented there was no rational way for UCB to put any settlement value on the punitive damage component of the fraud-based counterclaim, the court is a bit puzzled by UCB's apparent business decision to spend $360,000 in taking this case all the way to trial. In any event, under the unique facts presented, the court respectfully declines UCB's implicit invitation to use K.S.A. § 60-3702(b) as what would amount to a fee-shifting statute for the benefit of the prevailing party in an otherwise conventional commercial lawsuit.

In arriving at an amount of punitive damages sufficient to punish Super Film Turkey for its conduct, and to deter Super Film Turkey and others from similar conduct in the future,

the court has carefully considered and weighed all of the factors discussed above.  The court finds that $80,000 is an appropriate amount of punitive damages under the facts of this case.

## V.  Conclusion

In returning its verdict, the jury determined that UCB had proven by clear and convincing evidence that Super Film Turkey was culpable of either fraud or fraud by silence.  The court, despite the reservations expressed during trial, will not disregard the jury's considered verdict.  The court finds that the fraud verdict in UCB's favor is supported by clear and convincing evidence, and agrees with the jury's decision to impose punitive damages against Super Film Turkey.  The court is unpersuaded that Super Film Turkey is entitled to a new trial based on any purported error in the form of the jury verdict.

Accordingly, Super Film Turkey's motion for judgment as a matter of law, or in the alternative, for new trial **(doc. 175)** is denied.  The Clerk of the Court shall amend the judgment previously entered in this case (doc. 172), by adding a punitive damages award of $80,000.

IT IS SO ORDERED.

Dated this 27th day of September, 2005, at Kansas City, Kansas.


 s/ James P. O'Hara
_____
James P. O'Hara
U.S. Magistrate Judge